Please be seated.  Good morning. Jean Hudson for the United States. On April 27, 2013, Dmytro Patiutka was stopped by Virginia State Trooper Gregory Cox on I-81 in Virginia for having excessively tinted windows, tinted license plate cover, and failure to maintain a lane. Trooper Cox was a member of the Counterterrorism Interdiction Unit and a dog handler. Trooper Lemery riding with him was a Florida state officer. The stop was recorded on a video camera in Trooper Cox's patrol car. Trooper Cox approached Patiutka's Nissan automobile and asked him, Mr. Patiutka, a native of Russia or the Ukraine, for his driver's license. Trooper Cox saw a closed wallet on the console in the center of the car and noticed that Mr. Patiutka avoided looking in that wallet for his driver's license for some time. Cox thought that Patiutka's avoidance of his wallet was particularly suspicious. Patiutka eventually produced a Lithuanian driver's license from the right sun visor. The license listed the driver's name as Roman Pak and reflected a birth date with a month, a date, and then the year of 1990. Trooper Cox asked Mr. Patiutka what his birth date was, and Patiutka verbally gave a date that was eight years different from the date reflected on the license. Trooper Cox asked who owned the car, and Patiutka said it was his brother's and that he was in China. Trooper Cox ran the name and the license that he was given on this driver's license, and the results came back clear with no matches. In response to some further questions, Patiutka stated in contrast to his earlier answer that the car had belonged to his cousin. These facts gave Trooper Cox probable cause to believe that Patiutka had provided him with a false identity in violation of Virginia Code 19.2-82.1, probable cause to arrest Patiutka for that offense, and a reasonable belief that evidence of the false identity crime would be found in the vehicle by searching the car and its containers. But he told him he could go. He did tell him he could go later, and Trooper Cox's testimony was clear that though he told him he could go and was free to leave initially, he had never had any intention of actually letting Mr. Patiutka leave. And his testimony further was that this was their normal practice? That this was something he was trained to do, certainly a technique that he was trained to do. Yes, and I think he explained by letting them feel that they were free to leave, it made the next engagement perhaps a little more productive for him. And in this case it turned out to be so. The government sort of then has it both ways, don't they? Because often you're up here saying, oh, the person was free to leave. We are sometimes saying that. And because he was told by the cop that he was free to leave. But now we know that in your district that doesn't mean anything. Well, in this particular case I think the officer... No, the testimony is he's trained that way. So it wasn't this particular case. It's in all cases. So we're to, from now on, take that knowledge and know that when the policeman tells someone in your district you're free to leave, it doesn't mean anything. I don't think that the fact that he was trained to do this and that he employs that technique in many cases means that he employs that technique in every case and that anytime a police officer... So whenever the government wants to say he was free to leave, he's not employing that technique. Is that correct? It would just depend on the facts of the case, I think, Your Honor. In this case, Mr., excuse me, Trooper Cox did tell Pachuca that he was free to leave. He then engaged him further, asked him if he could ask a couple more questions about whether or not he had any cash in the car, whether he had any drugs in the car, and those things. Pachuca denied that he had any drugs in the car, said he had $100. And at that point Trooper Cox asked Pachuca if he would consent to the search of the car. At the time of the initial stop, based on the facts that Pachuca had from the false identity that was given him, he knew then that he had a birth date that was off by eight years, that Pachuca had taken some time to find his identification, had studiously avoided the wallet, that he had made a conflicting conversation, excuse me, statement regarding his brother and his cousin. On that basis, when a person gives a license with a particular birth date and orally states a date eight years different... Did the district court make a finding on that point, that he had provided a birth date that was eight years off and that the trooper heard that? I don't know that the court made a finding. I know the court did not make a finding that there was probable cause to arrest because the district court went immediately to... Well, I understand, but did the court make a finding with... I mean, there's all of this discussion about the car was pulled off by the side of the interstate and that he had an accent that was maybe difficult to understand and that there was a lot of noise going by and whatever. And so, did the district court actually make a finding as to whether Trooper Cox heard the birth date that was eight years off actually given? I mean, did he... The whole part of this puzzle is the false identification, but I couldn't find anything as to whether the district court made a finding one way or the other on it. Well, the court recited the facts at the beginning of its opinion, and on page 290 of the joint appendix, the court reflected Trooper Cox's testimony that Pachuca gave a birth date of eight years different from the date on the driver's license. And the court also stated in its opinion that the facts in this case were largely undisputed in large part because there was actually a video of the stop in the record. So, I don't think there was any confusion in the record that Trooper Cox had heard the statement according to his testimony. Did the search here proceed on the false identification representation with respect to the birth date, or did the search here proceed as a result of the consent? Well, I think if you look at Trooper Cox's... Which of the rationales... There are two possible rationales. One was the false identification rationale, and then the other is the fact that he consented, which was later revoked. Right. So, I think if you look at Trooper Cox, on the one hand, that he had the probable cause to arrest for the false identity offense. He knew that, he was aware of that, and believed that for what it's worth. But the facts certainly established that probable cause. It's also true that he said he went to get consent to search the car, and that he felt that despite the probable cause that existed, it was always better to get consent. So, when Trooper Cox started his search, and more importantly for this case, when Trooper Cox indicated by motioning his arm to Trooper Moore to come and assist in the search, it's certainly clear, as the court just noted, that Trooper Cox has two bases upon which to proceed with the search. At the point when Trooper Moore is asked to assist the search, of course it's the government's view that the court should have applied the collective knowledge doctrine. And under the vertical analysis in the Massenburg case from this court, Trooper Cox's knowledge would have been imputed to Trooper Moore, and our communication is, you can come search. He doesn't give him any rationale. The way I read this record, I don't understand why these people never talk to each other, but apparently they didn't. He motioned to him, he had, according to you, two bases, consent and probable cause, but he doesn't tell the other trooper what they are, he motions to him, and then he tells him to stop. So what the other trooper knows is, first I had a right, because I'm aware of the knowledge that the other person has, first I could, but now I can't. So two things I'd like to add to clarify there, your honor. One is, my reading of Massenburg is that the instruction itself... Well, before you get into that, it's clear from the record that Mr. Pachuca withdrew his consent to search, right? We don't dispute that Pachuca withdrew his consent. So at that point, Trooper Cox says stop. He says, alright, hold on, hold on. And so Trooper Moore stops. Trooper Moore stops very momentarily, but if I can clarify a couple of facts that I think are critical to understanding exactly what went on here. And I do think it's important to note in the context that in Massenburg, to me, Massenburg is clearly stating that the instruction itself communicates the information known to the instructing officer. The fact that I find most problematic about your position is the fact that Cox said to Moore, stop. And so why would we apply the collective knowledge... If he had said, go ahead, search, search, you would apply the collective knowledge doctrine, fine. But where the officer in possession of the knowledge says stop, then the whole rationale for the collective knowledge doctrine goes away. I mean, how can there be collective knowledge of a rationale to search when the person with the collective knowledge says stop, hold on? Well, our position, Your Honor, would be that Trooper Moore doesn't know exactly what it is that Trooper Cox knows, which is the whole point of the collective knowledge doctrine. So when Trooper Cox has two bases for the search and Trooper Moore doesn't know what either of those are... Well, I know, but when he says stop, stop the search... The person with the knowledge says stop. But the stop was only based on the revocation of consent. It had nothing to do with the fact that PC existed in the first place. But we don't know... Moore doesn't know that. Exactly. Moore doesn't know that. And so our position would be that the knowledge that was imputed to Moore stays with him and didn't evaporate simply because Cox made a mistake in effect. When Cox could have proceeded on with the search had he not said stop based on the revocation of consent, it doesn't seem that the collective knowledge doctrine should operate to invalidate a search, which if Cox had proceeded on, even after revocation, would have been entirely supportable. So your argument is that the consent was revoked, Trooper Cox made an error in not proceeding with a probable cause basis for the search, and somehow that's communicated to Trooper Moore under the collective knowledge doctrine. Yes, Your Honor. Because Trooper Cox doesn't say I'm giving you an instruction based on consent and on probable cause to arrest. Well, if he thought he had two bases to proceed and he lost one, he still had the other. Why would he have said stop? Because Trooper Cox simply made a mistake in stopping. He believes he needed to stop because of consent, but he never addressed the fact that the probable cause didn't evaporate. The implications of this are unsettling because you have somebody with the collective knowledge saying stop, and then the person to whom the direction stop is given goes ahead. And so in order to justify what Moore was doing here, you have to look at what Moore independently found before he was, before he started to search. Now, Moore did not know about the So we have to ask ourselves, once the direction stop was given, what did Moore independently know that would justify proceeding further? And you have the three iPads in the suitcase and a credit card reader. Now, what is your position with respect to those? I think if the court disagrees with us that collective knowledge applies here, we're in a much more difficult situation in justifying the search based solely on what Trooper Moore and because they're legal. Because these are lawful things. These are lawful things, and that's part of the difficulty with that position. But in context, Trooper Moore saw the card reader. He sees the card reader beside two suitcases. He opens the lid of the one suitcase. He sees four iPads, new in packaging, sitting on top of that suitcase and with what appears to him to be a suitcase full of the same thing. Admittedly, he hasn't seen the rest of it. But Cox didn't conduct the search. Cox did not conduct that search. So he was apprehensive about it. In fact, he told Moore not to. Well, I'd like to go back to that. Actually, all of the police officers on the video are there sort of collected at the back of the car there. Trooper Moore is doing his search while Trooper Cox has engaged Pachuca again in this very brief conversation. It's literally a matter of a few seconds where Trooper Cox is talking to Mr. Pachuca. When Trooper Cox says, all right, hold on, hold on, Moore looks up for just a minute and then just immediately says he's in investigative detention. And what's that? These people say you're free to go when you're not free to go. They have investigative detention, which I've never heard that as a category. That's not reasonable, articulable suspicion. That's not probable cause. That's something else. Right. And I mean, I think the court notes our argument that there's, you know, Mr. Pachuca is arguably arrested, in fact, when he's at that point. Let's just assume for purposes of argument that you're unsuccessful on the collective knowledge doctrine from Trooper Cox to Trooper Moore. So you're left with what a trooper, and this is what Judge Wilkinson asked, you're left with what Trooper Moore knew. Tell us why he could proceed with the search on that basis. I think there, I'd like to shift to the automobile exception, Your Honor. And on those grounds, our search was also justified under the automobile exception because, again, there was probable cause to believe that evidence of this offense would be found in the- Which offense? Of either offenses, arguably. Now, again, our brief and my position is that the collective knowledge doctrine, again, puts us in the best situation, also with the automobile exception. But for Trooper Moore- Trooper Moore said he didn't have- He said he didn't have probable cause to arrest. And you're just saying he does have probable cause. To arrest. I think Moore believed he had probable cause to search. He did not believe he had probable cause to arrest. And he had probable cause to search because- Because he said, based on his training and experience, a person who has a credit card reader and all these iPads almost certainly has credit cards and the other things that go along with credit card fraud. So if you have some legal things in your car, you almost certainly have some illegal things. That's his argument. That's why his probable cause is. He believed, based on his training and experience, that these items led him to have sufficient probable cause to search the car. So, again, without the collective knowledge doctrine, again, we're certainly in a- Does he ever testify, I have probable cause to search the car? I thought he said he did not have probable cause, and that's why he did this administrative detention or whatever it was. I believe he did. On page 230 of the JA, Trooper Moore said, I feel we had probable cause to continue the search, the vehicle at that time with just the four iPads and the credit card reader, but I don't feel like we had probable cause to arrest him. So that was his position. And he had earlier talked about his training and experience, which I think was significant to him in what he had seen in his experience was that an individual with a lot of credit cards- excuse me, he thought he was purchasing iPads, and that what he'd seen in his experience is that somebody would have the credit cards and so forth to go along with that. So his view, anyway, was that he had probable cause. You also have some time for rebuttal? Yes, Your Honor. Thank you. Ms. Harris, let's hear from you. May it please the Court, I'm Andrea Harris with the Federal Defender's Office here in Charlottesville. I'm here on behalf of Mr. Patuka. It's fitting that this case is being heard at a law school because the peculiar facts of this case read like a law school exam, invoking almost every exception to the Fourth Amendment's warrant requirement. The District Court's factual findings and the legal conclusions that were based on those factual findings are sound and should be affirmed. There are three points and sort of a bonus point I would like to make about that. The first is, with regard to a search incident to arrest, the Court found that there wasn't an arrest. And in order for a search to be incident to arrest, whether the search is before or after the arrest, there has to actually be a full custodial arrest. And that's what's lacking in this case, and that's why even if Trooper Cox felt that he had probable cause to arrest, in fact, he did not arrest. And I think the record's very clear about that. There are cases where the search precedes the arrest, so long as there's probable cause to arrest before the search. Right. And in those cases, the search and the arrest are usually pretty contemporaneous within moments most of the time, not necessarily all of the time, but within most of the time. Do we need to decide whether there's probable cause to arrest or not? What's being challenged here really is the search. Right, and I don't think you have to decide whether there's probable cause to arrest, at least on the false ID issue. And the court felt that it didn't have to make a finding on that issue and, in fact, didn't make a finding on that issue. I'm just not sure whether we – I'm not sure the court made a finding as to whether he provided a false birthday or not. I looked for that finding and I didn't see it. And so in light of that, I was hard-pressed to see how we were going to – get into the question of whether there was a probable cause to arrest. To me, the whole thing comes down to the various rationales for the search. Things seem to fall a little bit between the cracks in the government's case, but I just – the point is made that after Trooper Cox told Trooper Moore to hold off, that Moore had already searched the one suitcase and had found the three iPads and the credit card reader. Are you – and you made the point or the district court made the point that those are all lawful items to possess. It wasn't coming across contraband or anything like that. Are you making a broad point that the possession of lawful items can never provide probable cause for an automobile search? No, absolutely not. I think given the circumstances, absolutely lawful items could. I mean, suppose he had two or three credit card readers and five iPads. Right, and a stack of blank credit cards. All the things they found afterwards. All the things they found afterwards, which by themselves perhaps were also legal, but collectively certainly – So in other words, it's not the case that the possession of lawful items, no matter what they may be, invariably negate probable cause for an automobile search. No, no, I would agree with that. I think in this particular case – So why in the particular case did the possession of – I mean, the three iPads I can understand. The three iPads and the credit card reader is a little bit more problematic. Those two don't necessarily go together. Most of the people whom I know that possess multiple iPads don't have credit card readers. No, but you see in coffee shops all the time now, they've all switched to iPads and you skim your credit card off. They attach a credit card reader to the iPads. So the two things are not inconsistent with each other or necessarily indicative of criminal activity. So what's the lawful inference that would be drawn from the possession of the iPads and the credit card reader? You know, I don't think that there's any criminal inference that could be drawn. I mean, the iPads could be gifts for people. I mean, they're not terribly expensive. That's true enough. But the iPads plus the credit card reader, is this the owner of a – A small business. Of a small business that sells iPads? Or that uses iPads at the – That uses iPads in the business and has a credit card reader as part of the business? Right. So is the credit card reader one of those little square things you stick on the – No, there is a picture of it in the joint appendix, but it's not terribly big. It's maybe a little bit smaller or narrower than this black box. It attaches to the iPad and you run the card through it. It's not exactly like that type that you're probably thinking of, but it's one that, you know, it's a small skim box. What you're saying is that a credit card reader is an everyday implement in terms of a small business owner. Right, exactly, and in the record – And iPads are as well. Exactly. Can I ask you on something that is not raised by the government in challenging what happened below, but which may be a problem for you. Did the first trooper engage in the search ultimately that the second trooper was involved in? In other words, do you understand what I just asked you? After the consent was withdrawn, did the trooper more than agree to continue the search? Yes, yes. As the way I read the record, he did. I think that's correct. And he said in testifying that he was looking for evidence of the false statement. Well, he does say that. He says that after the fact because what he says before that – Well, of course, all the testimony is after the fact. Right, but what he says before that is, I was going to stop searching. Yes. And we were only searching based on whatever Trooper Moore found. He said, I was doing that. Right. This is my – I'm sorry. This is my problem. I think that he did have probable cause to search, and he continued to have probable cause to search, even when the consent to search was withdrawn. So since he had – avoid all of this transferred knowledge and things, but if he had probable cause the whole time, wasn't the search okay? That's when you get to whether – I'm not worried about transferred in time. I'm not worried about transferred knowledge. I'm just worried about him engaging in the search and his probable cause. And so didn't that make the fruit of this whole search okay? Well, and that's when you get to the issue that the court didn't decide, and that's the issue of whether there's probable cause on the false ID offense to begin with. And that's sort of the bonus argument I had prepared to argue here. And I talked about that in the brief, but that Trooper Cox's subjective belief that he received a birth date that was eight years different from the birth date that was on the ID that was – Well, it's not just a subject – there's no dispute about that. He did receive that. He testified that that's what he heard, but the court – You can't hear what he said. No, no. He didn't hear what he said about something else, not what he said about that. No. He said certain portions of the transcript were inaudible, but that they were immaterial to the court's finding. And that was one of the things that the district court found was inaudible. You couldn't tell. Where does the district court say it was inaudible? Because I do know that footnote you're talking about, and it doesn't go to that I didn't think. At the suppression hearing, Trooper Cox testified he also stopped Patuka for a lane change violation. Due to the level of noise on the video recording, the court could not determine whether Trooper Cox mentioned this to Patuka at the time of arrest. So that's where I thought. And then he says earlier, due to noise and traffic and parking, it is difficult to hear certain portions of the record. However, as the court finds that the search incident to arrest exception does not apply and that Patuka initially consented to the search and later revoked the consent, the inaudible portions of the recording are immaterial. He says that. That's the footnote that we're going to. And then he goes on to state the facts. And he doesn't say in the statement of the facts where Trooper Cox is testifying about. Um, the, the, uh. Birthdate thing that that that that was inaudible. No, he doesn't say that in that. Do you think that we have to read that that his initial footnote into that later? Well, and suggestion by the district court, the court statements at the time of the suppression hearing, the court clearly on that record, and I would have to take a minute to find that in the record, but the court clearly at the suppression hearing says, you cannot tell what birthday he says. Um, on the audio tape that's. And so that would be in the joint appendix, but it would be in the court's comments after the suppression hearing and that part of that, the transcript. Um, so it's not, it's not in the record. Where would we find that? I think, you know, I'll have to double check, but I believe that's in the appendix, um, the court's comments because there are a number and I, I didn't make a reference as to that particular thing, but there's a reference, um, to the court, um, stating things like, um. So after, after the suppression hearing, you're saying. At the end of the suppression hearing. And, um. What are you saying the court specifically said about the birthday? That, uh, you cannot tell what birthday was said on the video. You can, you know, 10 different people could listen to it. That's pretty good. You could hear 10 different dates, um, which is sort of how it went back and forth at the argument part of the suppression hearing. Um, I think in the court, a lot of the court's comments are around page 364 in the transcript. That's when the, I don't have the specific reference to that, but at the suppression hearing, the court says, even though the court doesn't make a finding on whether there was probable cause on the ID offense, the district court stated at the suppression hearing, it did not believe that there's sufficient probable cause to support an arrest for the offense. At the time the consent was withdrawn, referring to the false ID offense. And he then goes on to suggest that he thinks that this argument. At the time was just Monday morning quarterback and coming up. He does say that afterwards. And he, he comments about the fact that trooper Cox didn't say anything to trooper Lemery, who was the trooper that had been right there with him. That's for sure. Well, but I'm looking at me versus it's about, you can't tell I'm sorry. Excellent. Give us a page. Um, three 61. And it says here, you can't tell anything from that videotape as to what this person says with regard to the birth date. You just can't. I listened to it. We had three people listening to it. None of us could come up with the same numbers. Top of the page. Yeah. Top of the page. I don't know how the officer could possibly look at that video and say, yeah, he tells me. Um, and I have this minus. Well, I think that's pretty important for you because if it was, if it, well, it doesn't make much difference. So you have this good for you. Well, but I think that I think the key is, um, the court didn't dispute that, um, trooper Cox suspected that perhaps the birthday was inconsistent with the birthday on the driver's license. But what the, what, um, what the district court judge goes on to say in his comments at the suppression hearing is, you know, does the officer say anything to them? Memory referring to trooper memory about it? No. Does the officer do anything other than try and come up with a reason to search this vehicle, do anything like conduct any investigation before plunging ahead with a search. And so I think certainly he doesn't, in other words, there's sort of an implicit, he doesn't think the officer is credible. Well, and I'm not sure that he's even saying that he doesn't have to tell other officers about it. If he had probable cause, there's probable cause for the search. So he doesn't have to tell anybody about it. Right. But what I took, but you're suggesting that maybe he didn't, that he didn't have that probable cause and evidence of that is he didn't tell anybody else. Well, when you, when you look at the problem, it talks about, um, you know, what, uh, a person of reasonable caution would believe the facts and circumstances to believe. And so in those circumstances on the side of loud, loud and noisy highway, um, where they've demonstrated prior to this and difficulty hearing each other and difficulty understanding certain words, there were certain words that trooper Cox had to repeat because the district court make an explicit finding on that point. Well, it didn't need to, it didn't need to press by the government. Well, and it didn't need to, because it found that as a factual matter, the cert, there wasn't a custodial arrest to which the search was incident. So then you move on, you move on to the automobile exception. So if there's not a valid custodial arrest, the search incident to exception doesn't apply. So you move on to the automobile exception, which is what, what he did. And then you look at trooper car trooper, um, subjectively or not subjective, but objectively what information trooper more had and whether that was sufficient to believe that contraband or evidence of a crime would have been found in the car, because at this point trooper more is conducting the search of the vehicle and finds that no trooper, that that evidence simply wasn't enough. I mean, maybe it was suspicious, maybe it was enough to detain him and ask him some further questions. And I think that's basically the crux of the case that both trooper Cox and trooper more would have been justified in, in conducting an investigator, investigatory detention to ask further questions and figure out, well, was there probable cause for a search? And it would have taken just a couple of simple clarifying questions. What did you say your birthday was? It was one question. It's very odd. And, um, what do you, what are you doing with these iPads? What's this all about? Would be the simple question. Now trooper cop trooper more testified. And I think this is interesting and it suggests that there was in fact not reason to believe that the iPads and the credit card reader were contraband was I said, well, what if you stopped me when I left the courthouse here today? And I had four iPads and a credit card reader. And he said, why are they out in plain view? And I said, sure. And he said, well, I would have asked you some questions about it, which is what you would do. If you're suspicious, you would ask some questions, conduct some further investigation before you plunge ahead with a search requiring probable cause. And he said that he didn't do that because it wasn't, you didn't have to ask him the questions. And let's suppose, um, I'm not sure we want to say, well, you've got to ask questions and everything. That's not necessarily the way in which wants to direct law enforcement, but let, let's suppose trooper Cox, uh, did hear the false, um, birthday that the birthday was off of eight years, that he knew that, that he knew all of the, uh, what trooper Moore had had found before the consent was revoked. And he had all that knowledge. We don't need to talk about collective knowledge, but he had all that knowledge in his own head. Um, false birthday, credit card reader, the three iPads, and he, and collective knowledge aside, Cox knew it. Why is that not probable cause? That is probable cause. I think that's, I mean, you have to rely on the fact that the district court says that he couldn't hear it, right? That the district court had the tape. And the district court refers in its opinion, doesn't ever say he gave a false birthday. He says, you know, trooper Cox suspected that he was given, that he'd given a false birthday. He suspected it. So a suspicion is, is a different thing altogether. I'm just surprised the district court wasn't more explicit. District court didn't like the policeman's testimony. Well, and I, I, my, my experience with judges is they don't have, they don't make findings on things if they don't have to, they don't make rulings on issues if, if they can decide the case in a more narrow grounds. And I think that's perhaps what, um, what the district court did here didn't, because I had made the argument about the probable cause, um, as far as the false ID issue was concerned, but the court didn't feel like it needed to. What argument did you make that he had heard that there wasn't probable cause to arrest based on the false side, based on trooper Cox's belief that he had been given a false birthday. Because you couldn't hear that because he didn't have a belief because he couldn't really hear a reasonably cautious person would ask a few more questions in light of the facts and circumstances in light of the noise. If he's heard it, a reasonable cautious person doesn't have to do anything. Reasonably cautious person has probable cause. Right. But you have to rely on not being able to hear it. Right. Right. Okay. If there are no further questions, that's all I have. Thank you. Let's have some, let's come back to what Trupo Cox said. I mean, what Trupo Cox heard. Opposing counsel says that at least inferentially, the district court was unable to ascertain that Trupo Cox heard the false ID or the information that gave rise to his suspicion about providing a false ID. Did, is it your view that the district court did make an implicit finding that he did not hear the discrepancy in the birthday? Just briefly looking your honor at the particular page that, that, um, was being discussed a moment ago. It's certainly clear that the court thinks it can't hear from the video, what the number was, but the court is also recognizing Truper Cox's consistent testimony, including, um, I would say, uh, enhanced by Truper Cox's report, uh, from the incident. Does he at any point credit, does he at any point credit, uh, does he make a credibility finding or credit Truper Cox's, um, testimony on the fact that he was fully aware and had heard the eight year discrepancy in the birthplace and that a false ID was handed him? I mean, is it, does he make a credibility finding with respect to Truper Cox? Without looking at that more particularly, I don't think I could say, I think he recognizes the testimony. But the problem is that the district court didn't, wasn't enthused about, he wasn't the troopers testimony. So that contrary to making credibility finding for him, there's almost an implicit credibility finding against him. I mean, he keeps interrupting his testimony and saying, you, you said he was free to go, but you're now saying he wasn't free to go. Right. You were lying, weren't you? I mean, the district court really didn't believe, didn't think much of this officer. No, I think, and I think that comes through from the record. Very clear. What bothers me on this sort of narrow point though, is that it seems to me that, um, the court was focused mostly on what he could hear in the video and saying, it's just impossible to hear. So he was frustrated. I think that he couldn't make a call. He says, I don't believe there's sufficient probable cause to arrest him based on the testimony and after hearing that video, I don't believe that. Since Mr. Patuka prevailed below, would we have to take the evidence in the light most favorable to him? You do. I think you do have, I don't think there's any question about that. Um, and, um, um, so, so with that, I was going to point the court simply to, uh, the places in the record, which I, maybe the court is aware of these, but certainly Trooper Cox was consistent in his testimony that he did hear at least the birth year. I think there was some other testimony that's sort of irrelevant to this discussion about the day in the month, but, um, I think he was very consistent on, uh, the year that he heard. And again, the court is confused or, or unable to hear the year on the video. Um, I did also want to note in light of, um, not withstanding the court's comments, I understand those, uh, understand those, but I did want to note, uh, note six in Massenburg, which says that the instruction itself communicates that the instructing officer has the facts supporting the belief that he does. So, but then he stopped, right? I was just wanting to highlight that point for the, um, for the communication, not what those facts are with regard to that communication. Yes, your honor. So if there are no further questions. All right. Thank you very much. Thank you. Your honor. We like to, um, come down and greet council and then we will, uh, um, return to the bench. And, um, if you all have some questions about four circuit operations or some things that have occurred to you, we'd be, uh, um, happy to try to respond to those, uh, before we, um, all head for lunch. Right.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, G. Steven Agee